[Civ. No. 152.    Third Appellate District.—March 23, 1906.]

## JESSIE IRENE BOWEN, a Minor, by Her Guardian ad Litem, Respondent, v. SIERRA LUMBER COMPANY, Appellant.

ACTION FOR DEATH—NEGLIGENCE—DAMAGES—RECOVERIES.—In an action for death caused by the negligence of the defendant, such damages may be given as under all the circumstances of the case may be just; and there are no restrictions in this state as to the amount of the damages in such case, except that they must be just and not exceed the amount claimed, and they will not be deemed excessive within those limits, unless it can be said that they appear to have been given under the influence of passion or prejudice.

ID.—ACTION BY ORPHAN CHILD—DEATH OF FATHER—EVIDENCE—DAMAGES NOT EXCESSIVE.—In an action by an orphan child for the death of her father, caused by a rotten and insecure trestle maintained by defendant for logging trains, on which deceased was employed as a brakeman, where the evidence showed death of the father from defendant's negligence, that he was twenty-seven years old when he died, that plaintiff was then two years old, that deceased was receiving $40 per month and board, and has an expectancy of life for thirty-seven and forty-three hundredths years, a verdict for $5,000 damages cannot be held to be excessive compensation to plaintiff for the loss of her father.

ID.—PRESENCE OF CHILD IN COURT—PRESUMPTIONS.—The presence of the child in court, as plaintiff, was rightful, and can raise no presumption that it tended to show that the jury acted through passion or prejudice in rendering their verdict. The jury was sworn to

render a true verdict according to the evidence, and the presumption is, in the absence of evidence to the contrary, that each juror and the jury as a whole performed their sworn duty.

ID.—Testimony of Expert—Improper Evidence—Harmless Error.—It was not a proper subject of expert evidence that unsoundness of timber would have the effect to render a trestle only so strong as its weakest part, but its admission was harmless, that being the conclusion that any sensible juror would draw. It was also harmless improperly to allow an expert to state directly that the trestle was unsafe, where it was a necessary conclusion from the facts testified to by the expert and from other testimony that some of the timbers were rotten.

ID.—Proper Expert Evidence—Effect of Use of Nails—Weakness of Stringers—Short Life of Timbers.—It was proper to allow an expert witness to testify that the use of nails in putting the trestle together, without mortises or the boxing together of timbers, and without belts, were elements of weakness in the construction; that the effect of vibration of logging trains upon the trestle would be to loosen the nails used, and that bolts should be used in certain places; that the stringers used were too weak; and that the red fir timber used was short-lived, and would tend to rot when rained upon, and holding water at its joints and ends.

ID.—Impeachment of Witness—Contrary Declarations—Rottenness of Timber.—A witness for the defendant who had testified that after the wreck he found the timbers in a fair condition may, upon proper foundation laid therefor upon cross-examination, be impeached by the testimony of other witnesses that he had declared in their presence that the timbers in that trestle were rotten, and not fit for a dog to cross on.

ID.—Method of Examination of Timber.—Where it appeared that defendant's employee had tested the timbers a few weeks before the accident by sounding the timbers with an iron bar, evidence was admissible in rebuttal to show that sounding was not the proper method to ascertain the soundness of the timber, and that to bore into the timbers with an auger would be the proper method.

ID.—Support of Verdict—Conflicting Evidence.—Where there was no testimony indicating that the deceased was negligent, and the evidence was conflicting as to the condition and strength of the trestle, and as to the effect of rot thereupon, and there was no doubt that it broke down while the train was upon it, upon which the deceased was killed, the verdict against the defendant cannot be disturbed.

ID.—Harmless Modification of Instructions.—Modifications of the defendant's instructions, which left them as favorable to the de-

fendant as the instructions were before being so modified, were harmless.

Id.—Instruction Otherwise Given.—It was not error to refuse to give an instruction otherwise given in the charge of the court.

Id.—Regard of Jury to Instruction.—*Held,* that an objection that the jury disregarded the instructions of the court is not tenable, where a careful reading of the instructions, considered with the verdict, indicates that the jury applied the facts as they were established to their minds to the law as given in the instructions by the court, and rendered their verdict in accordance therewith.

APPEAL from an order of the Superior Court of Tehama County denying a new trial. John F. Ellison, Judge.

The facts are stated in the opinion of the court.

McCoy & Gans, for Appellant.

J. T. Matlock, and W. P. Johnson, for Respondent.

BUCKLES, J.—This is an action for damages on account of the death of Jesse Bowen, plaintiff's father, alleged to have been caused by the train of defendant's on which he was braking, falling through a high trestle. The complaint alleges that: "Through defects in the construction, care, and preservation of said trestle and through the negligence of the defendant in allowing the timbers of which said trestle was constructed to become worn, rotten and decayed, and without fault or negligence on the part of said Jesse Bowen, the trestle gave way, and the said track, locomotive, and train were precipitated to the ground and demolished, and the said Jesse Bowen was killed." The train was a "logging train" and the road over the said trestle a road used in running the logging trains carrying logs to defendant's mill. The complaint further alleges: "That plaintiff was entirely dependent upon her father for support, rearing, education, and protection; that she had been deprived of the society, comfort, and protection of her father by said wrongful acts of the defendant, and has, by reason of the said several wrongful acts of the defendant, been greatly injured and damaged." The plaintiff was about two years old at the time of her father's death and

about four years old at the time of the trial.  The mother of plaintiff died when plaintiff was only seventeen days old and Mrs. Blunkall, the grandmother of the said child, had always had the care of the plaintiff.  The complaint alleges: "That by reason of the said wrongful acts of the defendants, as herein alleged, she has been damaged in the sum of $10,000." The cause was tried by a jury, which rendered a verdict against the defendant for the sum of $5,000.  The defendant moved for a new trial, which motion was denied.  The appeal is from the order denying a motion for a new trial.

The appellant relies for a reversal upon the claim that the evidence does not support the verdict and that the damage is excessive, and errors of law at the trial.  The testimony as to amount of damages was as follows: Mrs. Elizabeth Blunkall was called as a witness and testified that Jesse Bowen was her son in law, had married her youngest daughter; that he was twenty-seven years old April 14, 1901, and that the plaintiff was the only child of her daughter and said Jesse Bowen, and was seventeen days old when the mother died, and plaintiff had lived with her ever since; that plaintiff was two years old when the father was killed; that said child had known no other mother than the witness and was taken care of by her; that said Jesse Bowen supported the plaintiff in his lifetime, and she had no other support.  J. C. Turner was called as a witness for plaintiff, and testified that at the time of his death Jesse Bowen was receiving as wages $40 per month and his board.  The plaintiff introduced the American Table of Mortality, which showed that the expectation of life of a man of twenty-seven years of age is thirty-seven and forty-three hundredths years.  Appellant argues that this evidence was not sufficient to warrant a verdict for $5,000 damages, and that the jury, only nine of which agreed to it, were prejudiced and influenced by the presence of the child, the plaintiff, in court at the trial.

This action was brought under section 376 of the Code of Civil Procedure, which reads as follows: "A father, or in case of his death or desertion of his family, the mother, may maintain an action for the injury or death of a minor child, and a guardian for the injury or death of his ward, when such injury or death is caused by the wrongful act or neglect of

another. Such action may be maintained against the person causing the injury or death, or if such person be employed, by another person, who is responsible for his conduct, also against such other person.'' The latter-part of section 377 of the Code of Civil Procedure also provides: ''In every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just.'' It will thus be seen that the amount of damages in a case like this, and the justness thereof, is to be determined by considering all the circumstances of the particular case, and there are no restrictions in this state as to the amount of damages in a case like the one at bar except that they must be just (not to exceed the amount claimed), and unless it can be said that the damages in this case appear to have been given under the influence of passion or prejudice, they will not be considered excessive. (*Redfield* v. *Oakland C. S. Ry. Co.*, 110 Cal. 277, [42 Pac. 822].) The verdict of a jury may be vacated and a new trial granted in the following cases: ''(5) Excessive damages appearing to have been given under the influence of passion or prejudice.'' (Code Civ. Proc., sec. 667.) How can it be said under the circumstances in this case that the sum of $5,000 is a larger sum than will compensate this little girl for the loss of her father, her natural protector? Appellant argues strenuously that there is nothing in the testimony to show what amount deceased contributed to the support of plaintiff, and nothing to show what she could reasonably expect from him had he lived. And that the evidence fails to show his earning capacity for any period. The facts shown by the testimony are that deceased earned at the time of his death the sum of $40 net a month. That the child was but two years old when its father died. That the mother was dead. That this was a female and the only child of its parents. The only thing in the case that is offered as tending to show that passion or prejudice had anything to do with causing the jury to fix the damages at $5,000 was that the child, the plaintiff, was in court at the trial and was seen by the members of the jury, and that the defendant was a corporation. To say the least, these are all violent presumptions, because there is not a single word in all the testimony

tending to show and no evidence after the trial indicating that a single member of the jury or of the nine who found the verdict were in any way prejudiced or influenced because the plaintiff was a small child and in court. The child, being the plaintiff, had a right to be in court, and therefore it cannot be presumed it was brought there for the purpose of influencing or prejudicing the jury. Neither is there anything in the record to indicate that the jurors were in the slightest prejudiced against the defendant because it was a strong corporation and probably a rich one. The jurors were sworn to render a true verdict according to the evidence, and under this oath their duty was to be fair and impartial, and the presumption, in the absence of evidence to the contrary, is that each juror and the jury as a whole performed the duties devolving upon him and the whole. As said in *Aldrich* v. *Palmer*, 24 Cal. 513, the law does not attempt to lay down any precise rules for the admeasurement of damages in cases of this character, but, from the very necessity of the case, leaves their assessment to the good sense and unbiased judgment of the jury. "Their verdict, as in all other cases, is subject to review by the court, but it will never be disturbed unless the amount of the damages is obviously so disproportionate to the injury proved as to justify the conclusion that the verdict is not the result of the cool and dispassionate consideration of the jury." These rules have been followed by our supreme court in all subsequent decisions and are founded on reason and common sense. The object in such suits must be to obtain a reasonable and just compensation for the wrong inflicted, comprehending both the present when the one receiving the hurt survives, and his future and the future of the dependent one as in this case. An exact solution of the problem as to what is just compensation in these cases is difficult, if not impossible, and surely none can be more competent to make the solution than a jury, and neither the court trying the case nor this court has any right to substitute his or our opinion for that of the jury merely because we might happen to differ. We are of the opinion the damages are not excessive as the compensation to this plaintiff for the loss of her father.

The next assignment of error is that the evidence establishes the fact that the appellant was not negligent in the construction or maintenance of the bridge or trestle which fell, causing the death of Jesse Bowen; but that the train was caused to go through the trestle because of the negligence of the deceased and his coemployees in not properly fastening the logs which were being carried to the mill upon the cars, thus allowing them to roll about, causing the cars to fall through said trestle. There were twenty-eight assignments of error as to the admission of testimony. The witness Gernon, by whom plaintiff sought to show the construction of the trestle, testified fully to the manner in which it was put up. In his details he testified to how guard-rails are put on bridges and that there were none on this trestle. He also testified to their safety where used in preventing a car from going off the bridge or trestle. Five objections were made to this line of testimony, but after the engineer had testified and described how the cars went down, on motion of defendant all the testimony of Gernon relating to guard-rails was stricken out. This disposes of defendant's exceptions 1, 2, 3, 4, and 5.

After having testified fully as to the manner of construction Gernon was asked the following question: "What would be the probable effect of the unsoundness of any of the timbers supporting this bridge?" Defendant objects on the ground that the question was not one of expert testimony. The objection was overruled. The witness answered: "The bridge is only so strong as its weakest part—any portion which might be unsound, why, of course, weakens the whole structure down to the strength of that defective part." We think that the objection that that matter was not expert testimony well taken. It is a matter of common knowledge that when there is unsound timber in a trestle where great weight comes upon it, such as running a train of cars loaded with sawlogs over it, that the structure would be weakened thereby, and a juror who would not be able to reach the same conclusion indicated by the witness' answer would not be fit for a juror. But under the rule laid down in *People* v. *Durrant,* 116 Cal. 215-218, [48 Pac. 75], and followed in *People* v. *Olsen,* 1 Cal. App. 17, [81 Pac. 676], the question and answer were absolutely without injury. This disposes of exception 8.

"Q. What were the elements of weakness, if any, in the construction of that bridge or trestle?" Objection was made by defendant on the grounds not material, not expert testimony, and that the witness had not shown himself to be an expert. Before the court ruled, the witness, to show that he was an expert, testified to having had under his charge the building of a number of bridges in Tehama county and that he had had charge of the building of some of the defendant's bridges, and that he had drawn the plans for them—for the trestle bridges similar to this one. The court overruled the objection, and the witness answered under the further objection (exceptions 9 and 10): "The bridge is put together with nails. It should—the principal timbers should—be joined by bolts," and proceeded further to show how the bridge or trestle should be put together. We think the witness has shown himself sufficiently qualified to testify as an expert and that the testimony was material. Continuing, the witness said: "This trestle was used to conduct logging trains from the logging camps to the mill to transport the logs from the logging camps to the mill. I was familiar with the size and the kind of loads to be hauled over it by the engines of the company." He answered that as originally constructed the bridge was not suitable and safe for the purpose for which it was used (exception 11), because it was put together with nails, without mortises or the timbers being boxed into each other, and without bolts, and is constructed upon a curve. (Exceptions 12, 13, and 14.) A witness may testify on questions of science, art, or trade when skilled therein. This witness had shown himself to be skilled in trestle and bridge building, and yet while the testimony may not have been strictly a question for an expert, yet in view of other testimony that there were rotten timbers in the trestle, we deem it a harmless error. Usually an expert cannot be asked whether a structure is a safe one, yet the cases all hold that the facts may all be elicited from the witness from which the conclusion inevitably follows. (*Sappenfield* v. *Main St. etc. R. R. Co.*, 91 Cal. 60, [27 Pac. 590].) Here the witness had testified fully to the manner of putting the trestle together and had compared this kind of trestle with other kinds, shown the difference between using nails or bolts, etc., and we think it

for the jury to have determined whether safe or not. But, as said above, in the light of the other testimony showing the rotten or decayed condition of some of the timbers in the structure which was discovered after the wreck, and which evidently contributed more than anything else toward the cause of the wreck, the error, if error at all, was not reversible error. (*Giraudi* v. *Electric Improvement Co.*, 107 Cal. 120, [48 Am. St. Rep. 114, 40 Pac. 108].)

The fifteenth exception taken by defendant is to the ruling of the court allowing the witness to testify to the effect of vibration of the trestle caused by running trains over it. That running an engine and cars over a high trestle may be a matter of common knowledge, but that such vibration will loosen the nails with which it is put together is not a matter of common knowledge to the extent that all persons of ordinary understanding might know it, and therefore it would seem to be a matter to be detailed by one who had gained that peculiar knowledge by his experience with such conditions. There was no reversible error in this. This witness then proceeded to describe the kind of bolts he referred to as the bolts proper to use in fastening the timbers together, as bolts with a round head on one end and a nut on the other, and where these bolts should be used to strengthen the trestle. This was exception 16. The testimony was entirely proper, and no error was committed in admitting it. The witness was asked: "What would be the comparative strength between these two stringers and a solid piece of timber eight by fourteen, and the reason?" Defendant objected. The court overruled the objection. (Exception 17). Prior to this the witness had testified: "As to the stringers, there were four timbers, and they were in pairs, two on each side. Those timbers were twenty-four feet in length, fourteen inches deep, and four inches broad and they were bolted together, two and two." It is not a matter of general or common knowledge which is the stronger, if any difference. A person who is learned in the art of handling and placing timbers in a structure like a bridge or trestle would know, while a person generally, without such experience, might not know. In this view there was no legal objection to the question. The witness Gernon was allowed, over the objection of defendant, to testify to the life of timber placed

in such a structure as this one. (Exceptions 18 and 19.) The evidence was that the timber used in this trestle was red fir and the witness had testified that he knew something about the life of such timber, and we think was competent to testify as to the average life of such timber. When asked what effect the elements would have on such timber defendant objected. (Exception 20.) The witness answered: That in the vicinity of defendant's mill, ''red fir timber, where it comes in contact with the ground, is very short lived, the worst of anything except white fir. Have seen twelve by twelve timbers of it rot off completely in five years when it was in the ground. When it is constructed into a bridge, where it would decay first would be where it would come in contact one piece with the other.'' When asked why was this the case, the defendant objected to the question as being incompetent. (Exception 21.) The objection was overruled and the witness answered: ''Whenever it rains and gets wet, it holds water in the joints and in the ends of the timbers . . . where two pieces cross each other there is where it will rot first.'' We think this an expert matter when the inquiry was to certain timber, red fir, and was therefore proper and competent.

Comer was a witness for the defendant and, on cross-examination, was asked: ''Did you not say to George McIvor, and in the presence of his wife, Mrs. McIvor, and Olive Blunkall at McKay's sawmill, in Siskiyou county, California, on or about the month of June, 1902, that the timbers in that trestle were rotten and not fit for a dog to cross on, or words to that effect?'' Defendant objected. (Exceptions 22 and 23.) This was an impeaching question, and seems to contain all that is required. On his direct examination he had testified that when he went to the wreck the next morning he found the timbers in a fair condition. He had also testified that ''frequently prior to that time [the wreck] we have doubled engines if we have difficult trains to haul'' over the trestle. The objection was properly overruled.

The witness, George McIvor, and wife were witnesses for plaintiff. When asked if the witness Comer made certain statements in their presence, being the same impeaching question asked Comer on his cross-examination above stated, ob-

3 Cal. App.—21

jection was made and overruled (exceptions 24, 25 and 26), and the witnesses answered that Comer did make such a statement. No legal objection is pointed out, and we are at a loss. to understand how any could exist.

It is claimed the court erred in overruling defendant's objection to the testimony of witness Bierce as to whether or not the sounding of timbers would be a proper method to ascertain their soundness, and also what would be the proper method of examination. (Exceptions 27 and 28.) The witness answered he thought that sounding would not be the proper method, but to bore into the timbers with a bit or an auger would be the proper method. The objection was made on the ground that it is "irrelevant, immaterial and incompetent and not proper testimony." Why so is not pointed out and we are unable to see why not material, competent and proper. The testimony clearly shows these facts: The wrecked trestle was built in the summer of 1889 and repaired at numerous times as decaying timbers were discovered. An inspection of the bridge had been made by an employee of defendant two weeks before the accident. The inspection was made by sounding a few of the timbers which had any decaying indications from the outside by striking with a bar. The trestle was three hundred and twenty-four feet long, constructed on a curve; greatest height is one hundred and forty-four feet. The structure went down while a train of one engine and three cars loaded with saw logs were passing over it, on September 23, 1901, and in the wreck thus made Jesse Bowen, the father of plaintiff, then a brakeman on said train, was killed. After the wreck a number of the pieces of timbers in the trestle were found to be rotten at the ends, and some of the mud sills were rotten.

There is absolutely no testimony indicating that the deceased was negligent. An effort was made to show that the logs were loaded on the cars in a negligent manner by deceased and his fellow-servants. This consisted in the evidence of several persons, witnesses in the employ of the defendant, testifying that Bundy, the engineer on the locomotive which drew the train that went down with the trestle, and was himself badly hurt, so that talking was difficult, had said soon

after the wreck: "I looked back and saw the logs rolling in the chains. I thought they would tighten, but they did not, and kept on rolling; and I saw the car begin to tip over, and I opened wide the throttle of my engine to break loose from the train." The engineer emphatically denies having ever said this, and then testified to what he did see, as follows: "I saw the cars settling down on the inside. That was the car next to the engine, and about that time the whole trestle went down. At that time I was standing up and looking back at that end. I had not noticed anything else unusual about the train. There were three logs on the car next to the engine." One witness is sufficient against a dozen if he is believed and the dozen are not, and the jurors were there to observe the demeanor of each witness while giving his testimony, and judge between them where a conflict arises and to determine who spoke the truth. The jury evidently determined that engineer Bundy never made the statement attributed to him. There was a great deal of testimony as to the manner in which this trestle was constructed and some conflict as to the best method of putting up such a trestle. There was a substantial conflict in the evidence, also, as to the condition of the timbers. The life or safety of such timbers as were used in said trestle was shown to be from five to fifteen years. There was evidence tending to show the best method of testing the larger timbers was by boring into them. No such test was made. When examined after the wreck all of the witnesses who made any kind of examination of the timbers found rot, but they differed as to the extent and what effect this rot would have on the strength of the trestle. These conflicts arising, the jury must determine and declare their finding by their verdict, and we have no right under the well-established rule in this state to disturb a verdict thus found.

Appellant complains of modification of its instructions by the court and refusal to give another. The first of these the court very properly refused to give because given in its own instructions. From an instruction containing the following: "It is a rule of law that where the evidence is equally consistent with the existence or nonexistence of negli-

gence, *when the balance is even as to which party is at fault,*
then the plaintiff has not made out a case by a preponderance
of the evidence,'' the court modified the same by striking out
the words italicized and inserted in their stead these words:
''On the part of defendant,'' and then gave the instruction.
This was as favorable to the defendant as the instruction
was before being so modified; the court had fully instructed
the jury on contributory negligence and that the plaintiff
could not recover if he had contributed to the injury. In
the following instruction asked by the defendant the court
struck out the words in italics and gave the rest: ''*The mere
fact that an accident happened to Jesse Bowen or that he
was killed does not entitle the plaintiff to a verdict.* The
plaintiff has no right to any verdict in the case simply upon
the assumption that said Bowen was injured in the wreck
which occurred upon the defendant's road. This is not a
case where a passenger, while riding in a car, had been injured
by an accident resulting from some defect or negligence in
the construction or operation of the road. In these passen-
ger cases, as a rule, the law presumes negligence from the
happening of the accident. But there is no such presump-
tion in this case. The said Jesse Bowen in this case was in
the employ of the defendant. You, are, therefore, not to in-
dulge any presumption nor to infer any negligence against
the defendant simply because an accident happened and an
injury was received.'' Without declaring whether the in-
struction, either in its original or modified form, correctly
states the law, it is manifest that no harm could come to the
defendant by striking out the first paragraph, for the sub-
stance is repeated in the very next sentence. The court re-
fused to give defendant's instruction No. 4. This instruction
relates to the weight of evidence, and the court had instructed
the jury fully and very properly upon the weight of evi-
dence. There was, therefore, no error in refusing the in-
struction. Further objections are made that the jury disre-
garded the instructions of the court in rendering its verdict
for plaintiff. A careful reading of the instructions, consid-
ered along with the verdict, indicates that the jury applied
the facts, as they were established to their minds, to the law

as given them in the instructions by the court, and rendered their verdict in accordance therewith.

We see no reason for disturbing the verdict of the jury. The judgment is affirmed.

Chipman, P. J., and McLaughlin, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeals, was denied by the supreme court on May 16, 1906.